49 N.J. Super. 532 (1958)
140 A.2d 411
THE CREWE CORPORATION, A CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF-APPELLANT,
v.
F. CHARLES FEILER AND MORRIS WEST, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued February 24, 1958.
Decided April 14, 1958.
*535 Before Judges GOLDMANN, FREUND and CONFORD.
Mr. Justin W. Seymour argued the cause for plaintiff-appellant (Messrs. Seymour & Seymour, attorneys).
Mr. Julius Fielo argued the cause for defendant-respondent F. Charles Feiler.
Mr. Melville J. Berlow argued the cause for defendant-respondent Morris West.
The opinion of the court was delivered by FREUND, J.A.D.
The issue here is whether a clause in a written lease for land and buildings which provides that "Landlord agrees to pay promptly municipal real estate taxes * * * and upon demand of the tenant to submit" evidence of payment can be interpreted to mean that the lessor is required to pay taxes only for the premises as improved at the time of the execution of the lease and the tenant to pay any taxes in excess thereof attributable to improvements made by the lessee.
This is an action at law by the landlord against the lessees to recover that portion of realty taxes assessed against the property and paid by the landlord, attributable to the improvements made by the lessees. Plaintiff appeals from a summary judgment in favor of the defendants, F. Charles Feiler and Morris West, entered on defendants' motion for dismissal pursuant to R.R. 4:58-2, before answer filed, on the ground that the complaint, together with plaintiff's affidavit in support thereof, shows palpably that there is no genuine issue as to any material fact and that said defendants have a right to such judgment as a matter of law. The defendant, Feiler, did not file any answering affidavit. Defendant West filed an affidavit incorporating *536 as a part thereof an agreement of release but he does not dispute any of the statements in plaintiff's affidavit.
The statement of proceedings, filed pursuant to R.R. 1:6-3, declares that the court determined the matter upon consideration of the pleadings, affidavits and the lease, which was submitted as an exhibit. Accordingly, for the purposes of defendants' motions for summary judgment, the allegations in the complaint and in the plaintiff's supporting affidavit are uncontradicted and are accepted as true. Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67, 73 (1954).
The plaintiff, The Crewe Corporation, formerly known as Orange & Domestic Laundry, Inc., had for many years conducted a general family laundry business in premises which it owns, commonly known as 177 Oakwood Avenue, in the City of Orange, New Jersey. Plaintiff decided to liquidate the business and sell the property and placed them in the hands of agents for sale. The president of the plaintiff corporation was introduced to the defendants who said they could not purchase for lack of available cash. "They said they were not interested in the laundry business such as we (plaintiff) had been operating but that they wanted to open up a quick service laundry business" on the first floor of the building and "proposed to sublet the 2nd floor * * * to a tenant like a dress manufacturer." The parties carried on negotiations resulting in the execution of a lease on October 30, 1953 for a term of 15 years commencing January 1, 1954 and ending on December 31, 1969, at a total rental of $112,500 payable in equal monthly installments of $625 per month. It is apparent that there is an error in the termination date; it should have been December 31, 1968. The lease grants the tenants an option to purchase for $60,000 upon stipulated terms, to be exercised before July 1, 1969. It may well be that this, too, is erroneous and that the parties meant 1968, but this is not in issue, and we are not called upon to make any decision either with respect to the termination date of the lease or for the exercise of the option.
*537 Several buildings stood on the premises in which plaintiff's laundry business was conducted. The lease contains a brief description of the lands and buildings demised, referring to five separate units, and annexed to the lease is a schedule containing a metes and bounds description consisting of four tracts.
Concerning the use of the demised premises, the lease provides that they are
"* * * to be used and occupied as a retail and commercial laundry, dry cleaning plant, and any other sundry and kindred enterprises which might be considered an adjunct of a laundry business, or such other lawful purpose as the tenant or any sub-tenant may require whether related to the laundry or dry-cleaning business, or not." (Emphasis added.)
The lease further stipulates that:
"The tenants are hereby granted permission immediately upon the execution of this lease to enter into and upon the premises for the purpose only of completing plans and making measurements in connection with the alterations which they contemplate."
Plaintiff's affidavit asserts that defendants purchased some of its laundry equipment in the building, moved in other laundry equipment, "organized a laundry firm known as `Three Hour Cleaning and Laundry Company' and erected a sign on the front of the building and proceeded to make alterations to the building for their proposed laundry." The affidavit further states that
"* * * the defendants before completing the alterations to the building for a quick service laundry above mentioned, abandoned such alterations and instead turned the building into an office building. To make such changes required a complete renovation of the building. All the laundry equipment and fixtures were removed as well as the old plumbing and heating system, light fixtures, partitions and sky-lights. New metal windows and light fixtures were installed, the floors, walls, ceilings and roof refinished, and new wash rooms and toilet facilities were installed on the 1st and 2nd floors. An open driveway was enclosed and added to the 1st floor, the front and side of the building was refaced with brick and a new front entrance and 2nd floor stairway were erected. The building was *538 completely air conditioned. The defendant Feiler told me that the costs of these improvements amounted to $75,000.00. Later the frame garage building was demolished and all the open area of the property was covered with black top for the parking of vehicles."
The lease contains no provisions respecting improvements or alterations of the premises. It merely provides:
"That the Tenant shall take good care of the premises and shall at their own cost and expense make all repairs of every kind without limitation, and at the end or other expiration of the term, shall deliver up the demised premises in good order or condition, damages by the elements excepted."
The affidavit of the president of plaintiff corporation states that he lives near the property and knew that the improvements were being made. He talked with the defendants about the improvements and, although defendants did not ask for his consent to make the improvements "except in a few instances when the municipal authorities required it * * * in each instance I gave my consent promptly." The affidavit does not indicate that plaintiff at any time offered any objection to the making of any of the alterations or improvements. During the course of the negotiations for the lease, he said "there was no discussion between us about the use of the premises for office purposes and such use was not contemplated by the parties. There was no discussion between us of large, extensive and expensive alterations and improvements and none were contemplated. The only thing contemplated was the continued use of the property for industrial purposes."
Having converted the buildings into an office building, defendants sublet the second floor to an insurance company by written lease for a term of five years from October 1, 1955 at an annual rental of $13,500, and the first floor to another tenant for a term of five years from January 1, 1956 at a rental of $56,750 for the full term. Both leases have options of renewal for a further term of five years.
For the years 1954, 1955 and 1956 the buildings were assessed for real estate taxes at $17,000, $20,000 and $20,200, *539 respectively, but for the year 1957, after the improvements were made by the defendants, the assessment on the building was increased to $57,100, while the land, which had been assessed for $6,400, was reduced to $5,400. Plaintiff alleges that by reason of the improvements the assessed valuation rose from $20,200 to $57,100, resulting in an increase of the municipal real estate taxes against the demised premises from about $2,000 to $4,700 per annum. The complaint seeks a money judgment for the taxes paid for the years 1956 and 1957 attributable to the improvements made by defendants. Plaintiff's brief states that under the terms of a mortgage plaintiff was obliged to pay all taxes levied upon the demised premises.
The lease provides:
"Landlord agrees to pay promptly municipal real estate taxes and fire insurance premiums and upon demand of the tenant to submit for inspection receipted bills for the same or adequate proof of payment."
Defendant West stands in a different position from defendant Feiler. By written agreement entered into on December 1, 1955, West assigned to Feiler all his right, title and interest in the lease with plaintiff, as well as his interest in the sub-leases. By the same written agreement, the plaintiff as a party thereto consented to the said assignment. West guaranteed plaintiff payment of the rent, and plaintiff released and discharged West "of and from any and all claims and liabilities heretofore accrued, or which may hereafter accrue under the provisions of the aforesaid lease." Plaintiff has no cause of action against defendant West, and the summary judgment in his favor was proper.
In this State municipal real estate taxes are assessed in the name of the owner of "each parcel of real property," N.J.S.A. 54:4-23, and the word "parcel" includes improvements, if any. City of Newark v. West Milford Tp., 9 N.J. 295, 305 (1952). Unpaid taxes are a lien against the lands on which they are assessed. N.J.S.A. 54:5-6.
As between lessor and lessee, the obligation for the *540 payment of real estate taxes upon demised premises is ordinarily upon the lessor. In Becker v. Mayor and Council of Borough of Little Ferry, 126 N.J.L. 338, 340 (E. & A. 1941), our former Court of Errors and Appeals held that "If the owner of land is desirous of avoiding taxes, which the tenant should pay, he may arrange so by contract." 1 Am. Law of Prop., § 3.76, p. 342 (1952); Tiffany, Landlord and Tenant, § 139, pp. 838-839 (1910); Underhill, Landlord and Tenant, § 598, p. 1005 (1909); Annotation, 73 A.L.R. 824, 825 (1931). The provision in the present lease that the "Landlord agrees to pay promptly municipal real estate taxes * * * and upon demand of the tenant to submit for inspection" proof of payment, expresses an explicit obligation, and actually calls upon the lessor to do two things which he is ordinarily not required to do  make prompt payment and submit proof of payment. An owner of realty may ordinarily exercise the privilege of not paying taxes promptly at the risk of consequent penalty.
In the absence of provision in the lease, if a tenant erects improvements which are not within the contemplation of the parties at the time of the making of the lease and which are removable by him at the end of the term or for which he is to be compensated by the lessor, he has been held liable for the payment of taxes on such improvements on the theory that the rents were not established with reference thereto. When the lessee makes improvements of a non-removable character or erects a structure of a permanent character on the demised premises, such improvements become the property of the lessor at the expiration of the term and the lessor bears the burden of paying the taxes imposed. People ex rel. International Nav. Co. v. Barker, 153 N.Y. 98, 47 N.E. 46 (Ct. App. 1897); People ex rel. Hudson River Day Line v. Franck, 257 N.Y. 69, 177 N.E. 312 (Ct. App. 1931); Callahan v. Broadway Nat. Bank, 286 Mass. 473, 190 N.E. 792 (Sup. Jud. Ct. 1934); La Paul v. Heywood, 113 Minn. 376, 129 N.W. 763, 32 L.R.A., N.S., 368 (Sup. Ct. 1911); Smith v. Sugar Creek Coal Co., 110 W. Va. 553, 158 S.E. 903 (Sup. Ct. *541 1931); 1 Am. Law of Prop., § 377, p. 345; Tiffany, op. cit. supra, § 141, p. 841; Underhill, op. cit. supra, § 598, p. 1005; 2 Walsh on Real Prop., § 165, p. 231; 51 C.J.S. Landlord and Tenant § 359, p. 1051; Annotation, 73 A.L.R. 824, 827 (1931).
When a tenant makes an improvement which is within the contemplation of the parties at the time of the execution of the lease and it is silent with respect to taxes thereon, the lessor has been required to pay the taxes where the structure became a part of the realty. Beck v. F.W. Woolworth, 111 F. Supp. 824 (D.C.N.D. Iowa, 1953). The same result has been adjudicated where the improvements were removable by the tenant at the end of the term, for the reason that the parties have been presumed to have so contracted with reference thereto. Spoor-Lasher Co. v. Newburgh Gas & Oil Co., 245 App. Div. 329, 280 N.Y.S. 587 (App. Div. 1935), affirmed 269 N.Y. 447, 199 N.E. 656 (Ct. App. 1936).
The construction of the terms of a written lease is a matter of law for the court. Crest Drug Store, Inc., v. Levine, 142 N.J. Eq. 652, 655 (E. & A. 1948); Longi v. Raymond-Commerce Corp., 34 N.J. Super. 593, 602 (App. Div. 1955). When a lease contains a covenant by the lessor for the payment of taxes and an issue arises concerning the liability for taxes upon improvements made by the lessee, the determination of the question depends, as in all other contracts, upon ascertainment of the intention of the parties from a construction of the lease as a whole in the light of the circumstances surrounding its execution. The circumstances to be considered are limited to those known and deemed reasonably to have been contemplated by the parties when the lease was executed. Events which occur subsequent to the execution of the contract and which were not in the contemplation of the parties at the time the lease was made are not influential in the construction of the lease. S.P. Dunham & Co. v. 26 East State St. Realty Co., 134 N.J. Eq. 237, 249 (Ch. 1943); Amoskeag Savings Bank v. Shell Eastern Petroleum Products, 89 *542 N.H. 30, 192 A. 149 (Sup. Ct. 1937); 51 C.J.S. Landlord and Tenant § 360b, p. 1052. Evidence of the situation of the parties and the surrounding circumstances is admissible in aid of interpretation, but not for the purpose of alteration, modification, enlargement or curtailment of the terms of the contract. Casriel v. King, 2 N.J. 45, 50 (1949); Borough of West Caldwell v. Borough of Caldwell, 26 N.J. 9, 24 (1958). The plaintiff's affidavit submitted on the motion and considered by the court in its determination supplied the evidence of the situation of the parties and the circumstances surrounding the execution of the lease.
In the Amoskeag case, supra, the lessor covenanted to pay "all taxes, assessments and other governmental or municipal charges levied or assessed upon the leased premises," upon which the defendant was to conduct a gas filling and auto service station. Improvements made by the tenant were attached to the land and could not be removed without total or partial destruction. Considering the tax clause in connection with the other provisions of the lease, the Supreme Court of New Hampshire in an advisory opinion enforced the provision. The court said:
"* * * because of the implied restrictions of the lease the defendant could not use the premises for any other purpose * * * and it is a fair inference from the agreed facts that the structures erected are merely such as the parties must have contemplated in view of the location of the leased property."
The rules of construction pertaining to a lease agreement generally tend to favor the tenant rather than the lessor and covenantor. Connecticut Land & Mortgage Co. v. Lesser, 136 Conn. 580, 72 A.2d 805 (Sup. Ct. Err. 1950); Lincoln Square Corp. v. Motor City Paper Tube Co., 339 Mich. 602, 64 N.W.2d 577, 46 A.L.R.2d 832 (Sup. Ct. 1954); Darrow v. Keystone 5, 10, 25, $1.00 Stores, Inc., 365 Pa. 123, 74 A.2d 176 (Sup. Ct. 1950); 51 C.J.S. Landlord and Tenant § 232, p. 859. In Black v. General Wiper Supply Co., 305 N.Y. 386, 113 N.E.2d 528, 530 (Ct. App. 1953), the court said:
*543 "We begin with the rule, now firmly fixed, that no charges shall be imposed upon a tenant in addition to those specified in the lease. `The law is well settled,' * * * `that changes in a lease are not to be presumed or implied; and no additional liability will be imposed upon a tenant unless it is clearly within the provisions of the instrument under which it is claimed. If the instrument contains any ambiguity it must be resolved against the landlord and in favor of the tenant.' 455 Seventh Avenue v. Frederick Hussey Realty Corp., 295 N.Y. 166, 172, 65 N.E.2d 761 (1946)."
It is particularly to be noted here that plaintiff does not ask for reformation or rescission of the lease on grounds of fraud or mistake. Nor is it contended that in providing in the lease that the lessor should pay "municipal real estate taxes" the parties failed by mischance expressly to state their true intention to provide that the lessor should pay municipal real estate taxes only on the land and improvements as they stood when the lease term began, the lessee to pay such taxes imputable to any increased assessed value from improvements to be made by the lessee. There is no such contention, because there obviously was no such failure of expression. The parties put down on paper exactly what they intended to be their agreement. What plaintiff really seeks in this action is to be relieved of the consequences of its bargain, because it did not realize the burdensome implications when the agreement was made.
It is a fundamental legal principle that the function of a court of law is to enforce a contract as it is written so as to effectuate the intent of the parties as gleaned from what it states, in the light of surrounding circumstances as of that time. The law will not make a better or different contract than the parties have seen fit to make for themselves, nor supply a term or condition with respect to which it is silent, merely because one of the parties is not in accord with its eventual pecuniary outcome. Kupfersmith v. Delaware Ins. Co., 84 N.J.L. 271 (E. & A. 1912); Washington Construction Co., Inc., v. Spinella, 13 N.J. Super. 139, 142 (App. Div. 1951), affirmed 8 N.J. 212 (1951). "It is not the judicial interpretative province to give effect to some supposed unexpressed intention of the *544 parties. The courts do not make contracts for the parties." Krosnowski v. Krosnowski, 22 N.J. 376, 386 (1956).
When a contract has been voluntarily executed by competent parties, without fraud or deception, there is no legal basis for refusal to enforce it or deny recovery thereon merely because it is unfair or harsh in its terms. De Caro v. De Caro, 22 N.J. Super. 463 (App. Div. 1952), affirmed 13 N.J. 36 (1953). It may be harsh to require the lessor to pay taxes on his property, as well as on the improvements made by the defendant, but no provision was made to apportion the taxes on account of the original assessment or upon any additional assessment.
The covenant in the instant lease is clear and unambiguous. The agreement by the plaintiff to pay "municipal real estate taxes" emphasizes the obligation which ordinarily rests upon a lessor without such provision. The use and occupancy clause does not restrict the lessee to the conduct of the laundry business but provides that the premises may be used for "such other lawful purpose as the tenant or any sub-tenant may require whether related to the laundry or dry-cleaning business, or not." It is reasonable to assume, and indeed the uncontradicted averments in the affidavit compel the assumption, that neither party contemplated the use of the premises as an office building at the time of the execution of the lease. But there is nothing to indicate that the parties could have regarded such use as offensive to the lease. The character of use permitted by the lease is unlimited in terms. The defendants began readying the premises for use as a laundry and it was during the course of these preparations that they departed from their purpose and converted the premises into an office building. From defendants' standpoint this proved to be a very advantageous financial afterthought, and taxwise decidedly to the disadvantage of the lessor. It is also reasonable to assume that the extensive and expensive alterations and improvements made by the lessees were made with the intention that they become a permanent part of the demised premises in anticipation of the exercise of the option to purchase. *545 It may be that if the plaintiff had anticipated the conversion which was made it might have insisted upon some scheme for apportionment of taxes. However, we may not make a new bargain for it. The parties might also have provided for restrictions against improvements or alterations without the consent or approval of the lessor, but they did not do so.
Our function is limited to construction of the agreement that the parties actually made, and "it is more consonant with the tenor of their lease to apply the general rule that obligations not imposed on tenants by the agreement should not be placed upon them by the court." Black v. General Wiper Supply Co., supra.
Plaintiff urges that the construction of the lease it espouses is called for by application of the rule of such cases as Casriel v. King, supra, and Atlantic Northern Airlines, Inc., v. Schwimmer, 12 N.J. 293 (1953), to the effect that evidence of surrounding circumstances is always admissible in the construction of a written agreement. The general soundness of that rule is indubitable, but, as was said in the Casriel case, a foundation for the construction contended for must be found in the language used. Where the extrinsic circumstances are sought to be used to show an "intention wholly unexpressed in the writing," or "at variance with any meaning that can be attached to the words," they are irrelevant (2 N.J. at pages 50, 51). The unexpressed intention of the parties is immaterial, except when reformation is sought. See George M. Brewster & Son, Inc., v. Catalytic Const. Co., 17 N.J. 20, 28 (1954). These principles are sound and applicable here. The references to taxes in this lease simply afford no foundation for the meaning contended for by plaintiff. The apportionment concept is "wholly unexpressed" in the written agreement. A good example of an appropriate use of the rule is afforded by the Schwimmer case, supra. There, a writing executed by the owner of a rented airplane, destroyed while under lease, discharging certain persons "from `all claims or demands whatsoever in connection with'" the aircraft, *546 was held broad enough, in the light of all attendant circumstances, to include any claim for the value of the use of the airplane. The contrast with the attempted use of the rule of interpretation in the present case is clearly revelatory of its inappropriateness here.
To accede to plaintiff's contention would necessitate rewriting the contract. We would be obliged to enlarge upon the clause and write into it a provision for apportionment of the taxes not now contained in the lease agreement: that the lessor should pay taxes on the premises as they were at the time of the execution of the lease and the lessee upon improvements made by them thereafter. These are matters upon which the lease is silent and have been omitted. We may not supply the omission in an action at law for recovery of a money judgment under the lease agreement.
In arriving at the foregoing conclusion we have necessarily taken into consideration common practices with respect to provisions relating to taxes and improvements in commercial leases. It is common for lessors, when so minded, to limit their responsibility for taxes as against the tenant; for example to the extent of the amount levied the first year of the lease term, or upon the improvements then standing, or in other respects. For the court to supply such provisions by construction of a lease, absolutely unambiguous on its face, on theories of fairness and equity, in order to cure a supposed oversight by one of the parties when the lease was drawn, would be to introduce a dangerous precedent and possibly to unsettle many leases now in existence. It is common knowledge that parties to leases frequently become disaffected with their terms during the lease period and seek rescue from provisions which later events render burdensome.
The judgment is affirmed.
GOLDMANN, S.J.A.D. (dissenting).
I agree that summary judgment in favor of defendant West was properly granted by reason of plaintiff's consent to West's assignment to Feiler of all his right, title and interest in the *547 lease as well as the subleases. I must, however, respectfully dissent from the majority decision affirming the summary judgment in favor of defendant Feiler.
My brethren have said, in effect, that the unambiguous language of the tax clause in question requires the landlord to pay all real estate taxes regardless of the possible circumstance that the extensive improvements made were not within the contemplation of the parties at the time the lease was executed and, indeed, were made for a purpose other than the main one for which the property was leased. I am not persuaded that this is a proper view on a motion for summary judgment under the circumstances of this case.
There was only one affidavit before the trial court  that of plaintiff's president  which gave the complete background of the negotiations leading up to the lease and defendants' improvements and use of the premises thereafter. West's affidavit deals only with the assignment to Feiler, and Feiler filed no affidavit whatsoever. It is on the basis of the pleadings and these affidavits that summary judgment was granted.
Plaintiff's affidavit recites that the property in question had for many years been used for a general family laundry business, and was fully equipped for that purpose. Defendants became interested in the purchase of the business and property, but for a quick service laundry rather than plaintiff's type of operation. Their offer to purchase was rejected as unsatisfactory. Further negotiations led to the lease with an option to buy.
Plaintiff's affidavit states  and it is not contradicted  that defendants said they proposed to use the first floor of the main building as a quick service laundry and to sublet the second floor to a tenant like a dress manufacturer. They purchased part of plaintiff's laundry equipment and installed some of their own. As part of the terms of the lease and in order that they might continue the operation of the laundry, they required plaintiff to leave a heating furnace, hot water system, water softener and elevator on the premises. They proceeded to organize a laundry company, *548 erected an appropriate sign on the front of the building, and made alterations for their proposed laundry.
Before completing alterations for a quick service laundry defendants, as detailed in the majority opinion, abandoned their alterations and instead turned the property into an office building. This required a renovation of the structure, the removal of equipment and fixtures, and the installation of proper office building facilities, at a cost of $75,000.
All these improvements, it is said, were made by defendants with regard to their intention to buy the property under the option, and they treated the property as their own. Whatever building equipment was removed, they sold, and retained the proceeds.
Plaintiff's affidavit specifically alleges:
"During the course of negotiations between the agent Mr. Loftus and the defendants and me there was no discussion between us about the use of the premises for office purposes and such use was not contemplated by the parties. There was no discussion between us of large, extensive and expensive alterations and improvements and none were contemplated. The only thing contemplated was the continued use of the property for industrial purposes. * * *"
As stated, this allegation was not controverted.
Defendants now have the right to buy the property at the fixed option price of $60,000. They have spent upwards of $75,000 in improvements and have fully subleased the property so that they enjoyed an income of some $1,450 a month over and above the agreed rental. It is an almost inescapable conclusion that they will exercise their option under the lease.
The majority recognizes that the determination of the question as to liability for taxes upon improvements made by defendants depends "upon ascertainment of the intention of the parties from a consideration of the lease as a whole in the light of the circumstances surrounding its execution. The circumstances to be considered are limited to those known and deemed reasonable to have been contemplated by the parties when the lease was executed."
*549 It is well settled that evidence of the circumstances surrounding the execution of a contract is always admissible in aid of its interpretation, and this is so even when the agreement on its face is free from ambiguity. It was said in Casriel v. King, 2 N.J. 45, 50 (1949), that
"The polestar of construction is the intention of the parties to the contract as disclosed by the language used, taken as an entirety; and in quest for the intention, the situation of the parties, the attendant circumstances, and the objects they were thereby striving to attain are to be regarded."
And see Atlantic Northern Airlines, Inc., v. Schwimmer, 12 N.J. 293, 301-302 (1953). The majority recognizes this principle but, in my view, departs from it.
The majority declares the function of a court to be "to enforce a contract as it is written so as to effectuate the intent of the parties," and that the law "will not make a better or different contract than the parties have seen fit to make for themselves, nor supply a term with respect to which it is silent, merely because one of the parties is not in accord with its pecuniary outcome." That is unquestionably the law. The majority then concludes that "To accede to plaintiff's contention would necessitate rewriting the contract." I do not agree that this court would be rewriting the contract when, in quest of the intention of the contracting parties, it examines into their situation, the circumstances surrounding the execution of the agreement, and the objects they were thereby striving to attain.
We must not forget that we are dealing here with a summary judgment. In decision after decision we have emphasized that the standards governing the grant or denial of a summary judgment require that the party opposing such a motion is not to be denied a trial unless the moving party sustains the burden of showing clearly the absence of a genuine issue of material fact. R.R. 4:58-3 underscores this in the requirement that the absence of undisputed material facts must "palpably" appear. All inferences of doubt are drawn against the movant in favor of *550 the opponent of the motion; papers supporting the motion are closely scrutinized and opposing papers indulgently treated. Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67, 74-75 (1954).
There is not a word in contradiction of plaintiff's positive allegation that the use of the premises for office purposes, or that there were to be large, extensive and expensive alterations and improvements, were not within the contemplation of the parties. Nor is there any negation of its statement that the only use contemplated was the continued use of the property for industrial purposes. The majority recognizes all this.
The mere fact that the landlord could have, but did not, protect himself against the possible eventuality of having to pay taxes under circumstances like those presented by this case, is not dispositive of the question of tax liability  certainly not without an examination into the circumstances attendant upon the execution of the contract. Suppose, at the time of the execution, the parties had clearly understood that the property was to be used as a laundry or some business or industrial activity, with only such alterations as were necessary to the purpose, and that there were to be no improvements which would substantially change the character of the building and increase the tax burden. Could it then be said that the landlord must pay the increase where defendants subsequently erected additional stories or additional structures at an expenditure of several hundreds of thousands of dollars, and all this with the foreknowledge that they could eventually have the premises for $60,000 under their option to buy? One can readily imagine a situation where the improvements were so extensive and so radically changed the character of the building as to result in a tax burden so great that the landlord could not meet it and thereby would lose his property. A landlord's covenant to pay taxes and subsequent improvements by the tenant were involved in Phinney v. Foster, 189 Mass. 182, 75 N.E. 103 (Sup. Jud. Ct. 1905) and Kentucky Farm & Cattle Co. v. Williams, 140 F. Supp. *551 449 (D.C.E.D. Ky. 1956). Examination by the court of the actual intent of the parties when they executed the lease resulted, in both cases, in the increased tax burden being placed on the tenant.
In my view, a factual issue as to the intention of the parties was raised by reason of uncontradicted allegations of plaintiff's affidavit, so that under the Judson case summary judgment should have been denied. I would remand the case for a plenary hearing as to defendant Feiler, to determine what was actually within the contemplation of the parties at the time of the execution of the contract. Should the matter be resolved in plaintiff's favor, it will also be necessary to determine whether the increased taxes were entirely due to defendants' improvements or whether part of them is attributable to an increase in the tax rate or perhaps to a general program of reassessment in the municipality.